Eduard Korsinsky (EK-8989)
**LEVI & KORSINSKY LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com

*Attorneys for Lead Plaintiffs and*
*Lead Counsel for the Proposed Class*

(Additional counsel appear on signature page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SANDI ROPER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SITO MOBILE LTD., JERRY HUG, and KURT STREAMS,<br><br>Defendants. | Case No.: 2:17-cv-01106-ES-MAH<br><br><u>CLASS ACTION</u><br><br><u>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u><br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Red Oak Fund, LP, Red Oak Long Fund LP, Red Oak

Institutional Founders Long Fund, and Pinnacle Opportunities Fund, LP (collectively,

"Lead Plaintiffs" or the "Red Oak Funds"), by their undersigned attorneys, allege in

this Amended Complaint for Violations of the Federal Securities Laws (the

"Complaint") the following upon personal knowledge with respect to their own

acts, and upon facts obtained through an investigation by their attorneys and review of documents and materials including but not limited to: (a) relevant filings made by SITO Mobile Ltd. ("SITO Mobile" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) public documents, conference calls, and press releases; and (c) research analysts' reports concerning the Company.

Lead Plaintiffs believe that further substantial evidence exists for the allegations set forth herein after a reasonable opportunity for discovery. Certain facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit alleging violations of the Securities Act of 1933, 15 U.S.C. §77a *et seq*. (the "Securities Act"), and Securities Exchange Act of 1934, 15 U.S.C. §78a *et seq*. (the "Exchange Act"). Lead Plaintiffs allege that Defendants acted with negligence and/or scienter when making false and materially misleading statements and omissions about SITO Mobile's operations and finances. These false and materially misleading statements and omissions induced Lead Plaintiffs and other similarly situated shareholders to purchase shares of SITO Mobile common stock at artificially inflated prices. When the truth was revealed, the value of SITO Mobile common stock declined significantly and, as a

result, Lead Plaintiffs and other members of the Class suffered substantial damages.

2.      SITO Mobile operates within the advertising industry. The company describes itself as a "mobile location-based media platform" that provides its customers with the ability to "create advertising content targeted to audiences, based on location, interests, behaviors and loyalty." SITO Mobile places customer advertisements on consumer mobile phones at particular times and places when, according to the company, the advertisements are likely to be most effective.

3.      SITO Mobile began trading on the NASDAQ Capital Market on August 10, 2015. Prior to that time, the company's common stock was quoted on the OTCQB maintained by OTC Markets, Inc. Approximately one year later, on September 16, 2016, SITO Mobile conducted its first stock offering to the public. SITO Mobile sold over 2.5 million shares of its common stock to the public at $3.75 per share. SITO Mobile generated over $10 million in proceeds from the offering.

4.      SITO Mobile's public representations preceding, during, and after the company's initial public offering contained false and materially misleading statements and omissions. These statements and omissions related to, in particular, the 2016 presidential election and the material negative impact that it had on the company's sales and revenues. Defendants also omitted to tell investors that they

3

were, and had been, misappropriating funds from the company through illicit expense reimbursement requests, cash withdrawals, and credit card charges.

5.       The year 2016 was a presidential election year. Political elections are known to have an effect on advertising spending. The particular effect, referred to by industry experts as "political crowd out," results in lower advertising spending by non-political retail businesses seeking to avoid inflated prices for advertising space and increased competition for prime advertising slots. The 2016 presidential election resulted in an especially strong "political crowd out" effect given the fact that the election involved over 20 presidential candidates, some of whom received inordinate amounts of media coverage.

6.       Defendants omitted material information concerning the then-current (and highly negative) impact of the 2016 presidential election on SITO Mobile's operations and revenue during the third and fourth quarters of fiscal 2016 coincident to their public offering. In so doing, Defendants were able to conduct the company's initial public offering with substantial success as well as continue to fund the ongoing misappropriation scheme that ultimately led to the terminations of SITO Mobile's former chief executive and financial officers, Defendants Jerry Hug and Kurt Streams.

7.       On November 14, 2016, SITO Mobile reported its earnings for the third quarter of fiscal 2016 (ended September 30, 2016). Although Defendants

4

reported weaker demand at that time, they attributed it to "seasonality" and not to the 2016 presidential election. Notwithstanding, investors noticed the slowing demand, perceived the company's statements as a partial corrective disclosure, and reacted accordingly. Over the course of the next three days, the price of SITO Mobile's common stock declined by 26%, falling from $5.34 per share on November 14, 2016 to $3.94 on November 17, 2016.

8.     Approximately six weeks later, Defendants announced SITO Mobile's preliminary financial results for the fourth quarter of fiscal 2016 and, for the first time, confirmed that SITO Mobile's revenue had been materially impacted in a negative manner by the 2016 presidential election. On January 3, 2017, SITO Mobile announced that its media placement revenue for the fourth quarter of fiscal 2016 had been "negatively affected . . . by restrained advertising spending during a period of heightened and elongated media focus on this year's U.S. election." In a press release dated January 3, 2017, Defendant Hug stated that, "[SITO Mobile] clearly underestimated the effects of this year's election on our clients' campaign spending."

9.     Investors once again reacted swiftly to the company's disclosure. From a closing share price of $3.69 per share on December 30, 2016 (the last trading day prior to January 3, 2017), SITO Mobile's stock price declined to $2.50

per share on January 3, 2017, a drop of approximately 32%, on unusually heavy trading volume.

10.     The 2016 presidential election was significant, and impacted SITO Mobile's revenues from continuing operations in a materially negative manner. Defendants failed to disclose material information concerning the effects of the election on SITO Mobile's business—as well as the fact that they had been misappropriating funds from the company—at the same time they were promoting the company's success and seeking to raise funds from an uninformed public. As a result, Defendants violated the Securities Act and Exchange Act. Collectively, Defendants' violations caused SITO Mobile's market capitalization to decline by approximately $40 million, resulting in significant losses for Lead Plaintiffs and other members of the Class.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k, and 77o(a)) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) because the Company's headquarters are located in this District and certain of the acts alleged in this Complaint occurred in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Lead Plaintiffs, as set forth in their Certification accompanying their motion for appointment as lead plaintiff (Dkt. No. 11-3), purchased common shares of SITO Mobile at artificially inflated prices during the Class Period, including purchases of SITO Mobile's common stock in the company's initial public offering in September 2016, and was damaged in connection with the alleged corrective disclosures.

16.     Defendant SITO Mobile is a Delaware corporation with its principal executive office located at 100 Town Square Place, Suite 204, Jersey City, New Jersey 07310. SITO Mobile's common stock trades on the NASDAQ Capital Market under the ticker symbol "SITO".

17.     Defendant Jerry Hug ("Hug") is the company's former Chief Executive Officer ("CEO"). Hug joined SITO Mobile in 2011 as the company's Director of Corporate Development. He was promoted to Executive Vice President in March 2013. Hug served as CEO from August 27, 2014 until February 17, 2017.

18.     Defendant Kurt Streams ("Streams") is the company's former Chief Financial Officer ("CFO"). Streams joined SITO Mobile on November 1, 2013 as CFO. Hug served as CFO from November 1, 2013 until March 10, 2017. Hug also served as Chief Operating Officer ("COO") from December 20, 2016 until March 10, 2017.

19.     Defendant Betsy J. Bernard ("Bernard") served as a director of SITO Mobile from July 15, 2014 through June 1, 2017. Bernard was removed from SITO Mobile's board of directors on June 1, 2017.

20.     Defendant Jonathan E. Sandelman ("Sandelman") served as a director of SITO Mobile from December 10, 2012 through June 1, 2017. Sandelman was removed from SITO Mobile's board of directors on June 1, 2017.

21.     Defendant Peter D. Holden ("Holden") served as a director of SITO Mobile from March 29, 2013 through December 5, 2016. Holden resigned as a director of the company on December 5, 2016.

22.     Joseph A. Beatty ("Beatty") served as a director of SITO Mobile from September 9, 2014 through June 1, 2017. Beatty was removed from SITO Mobile's board of directors on June 1, 2017.

23.     Defendant Richard O'Connell, Jr. ("O'Connell") served as a director of SITO Mobile from February 18, 2016 through June 1, 2017. O'Connell also served as interim CEO from February 17, 2017 until June 1, 2017. On June 1, 2017, O'Connell was removed from SITO Mobile's board of directors and relieved of his position as interim CEO.

24.     Defendant Brent Rosenthal ("Rosenthal") has served as a director of SITO Mobile since August 9, 2016. On June 1, 2017, Rosenthal became Chairman of SITO Mobile's board of directors.

25.     The Defendants referenced above in ¶¶17-24 are sometimes referred to herein as the "Individual Defendants."

## CLAIMS FOR RELIEF UNDER THE SECURITIES ACT
### The 2016 Presidential Election Negatively Impacted SITO Mobile's Revenue

26.     SITO Mobile specializes in mobile location-based advertising and mobile messaging. SITO Mobile provides a platform serving businesses, advertisers, and brands that allows them to create real-time targeted content based on location, interests, behaviors, and loyalty. Through its platform, SITO Mobile

delivers display advertisements and videos on behalf of its customers directly to consumers' smartphones.

27.     SITO Mobile generates revenue from selling mobile advertising campaigns that feature, for example, banner advertisements on mobile devices. Revenue is based on the media metrics utilized in internet advertising, *i.e.*, the number of audience impressions and the cost-per-thousand price to broadcast to a given audience.

28.     SITO Mobile recognized revenue from its media placement product based on the activity of mobile users (consumers) viewing advertisements through applications and mobile websites. The company recognized revenue upon the delivery of advertising services in accordance with the terms of its advertising contracts, which according to SITO Mobile were commonly based on the number of advertisements delivered.

29.     SITO Mobile generated a material amount of its revenue from just a small number of customers. For the fiscal year ended December 31, 2016, SITO Mobile generated approximately 19% of its revenue from contracts with one specific advertising agency customer.

30.     SITO Mobile generated $28,911,717 in media placement revenue for the fiscal year ended December 31, 2016. SITO Mobile accrued an operating loss of $1.4 million for the same period. As of December 31, 2016, SITO Mobile held

$8.7 million in cash and cash equivalents; $6.1 million of this amount was attributable to SITO Mobile's September 2016 public offering.

31.    The following table shows SITO Mobile's media placement revenues for each quarter during fiscal years 2015 and 2016:

| 2015 | | | |
|---|---|---|---|
| First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| $1,627,500 | $2,154,000 | $3,023,200 | $5,345,500 |
| 2016 | | | |
| First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| $4,861,500 | $8,297,900 | $8,424,100 | $7,328,200 |

32.    SITO Mobile's revenue for fiscal year 2016 was materially impacted in a negative manner by the 2016 presidential election. Compared to the year prior, SITO Mobile's media placement revenues slowed dramatically between the second and third quarter and then declined during the fourth quarter.

33.    SITO Mobile's revenue shortfall during fiscal 2016 was caused by the 2016 presidential election and an effect referred to by advertising industry experts as "political crowd out."

34.    Political elections routinely effect advertising spending. As an initial matter, political elections prompt significant demand for advertising space. Political candidates seek to disseminate their campaign messages to as many potential voters as possible and, as a result, purchase as much advertising space across as many different mediums as possible. The increase in demand results in an extreme uptick in pricing and competition for advertising space.

11

35.     This, in turn, results in a preclusive effect for ordinary retailers seeking to purchase advertising space for purposes unrelated to the political elections. Within the advertising industry, this effect is referred to as "political crowd out." The effect similarly occurs during periods preceding large-scale, highly publicized events, such as the Olympics.

36.     The "political crowd out" effect that occurred in 2016 was particularly significant, as the 2016 presidential election was extremely divisive and highly publicized given the number of candidates running as well as their individual personalities. Industry analysts, such as the Center for Responsive Politics, accurately forecasted that the 2016 presidential election would experience the largest amount of political advertising spending in history. Indeed, political candidates running for federal office spent approximately $6.8 billion, compared to $6.3 billion in 2012 and $5.3 billion in 2008.

37.     The intensity of political advertising during the 2016 election season dramatically effected non-political retail spending on advertising. AdvertisingAge, a leading global source of news and analysis in the marketing and media community, published an article on October 22, 2015 titled *Advertisers May Suffer 'Political Crowd Out' as 2016 Elections Near*. The article explained that "[u]nprecedented ad spending" by political candidates was resulting in "a dearth of attractive TV time slots and a spike in rates." According to the article, national and

regional advertisers were anticipated to confront significant trouble in terms of purchasing advertising given the increase in advertising spending from "super PACs" as well as the fact that there were more than 20 presidential candidates from both parties.

38.   In response to the increased political advertising, industry experts were advising non-political retailers to adjust their campaigns and advertising spending accordingly. For example, the Television Bureau of Advertising, a not-for-profit trade association, advised non-political advertisers to purchase advertising space early and budget appropriately for pricing well above average rates.

39.   Other industry experts, such as the Association of National Advertisers, advised non-political advertisers to avoid spending on advertising until after the November 2016 election.

40.   Industry participants identified the potential risk of "political crowd out" as early as July 2015. Marcus Thomas LLC, a premier marketing communications agency, published an article on July 15, 2015 titled *Media Impact For Brands During Political Election Years*. The article discussed the fact that increased advertising by political candidates and related entities "creates havoc" for commercial brands "to continue advertising as usual."

41.     After the election passed, a number of financial analysts discussed its effects on the advertising industry. For example, on December 21, 2016, analysts from Craig-Hallum Capital Group LLC, in a report about SITO Mobile in particular, said that "[w]hile demand for [SITO Mobile's] offering remains strong, *we think the drama around the election* and Facebook's ad metric discrepancies caused a short term disruption around their business and we are lowering our 2016 estimates to reflect this" (emphasis added). The report further stated, in a section titled *Election Noise Creates Disruption for Ad Companies*, that "[w]e believe that *all the noise in the weeks surrounding the election caused advertisers to considerably pull back their spending*. As a result, we think many players in the advertising space, including SITO [Mobile], saw a temporary decrease in revenues" (emphasis added).

42.     The analyst firm Ladenburg Thalmann issued a report stating a similar conclusion on January 10, 2017. Titled *Advertising Activity Negatively Affected by 2016 Presidential Election*, the report stated that "[w]e believe that brands pulled back on discretionary campaigns during those weeks *not wanting to compete with the constant flow of political ads* and the ever present news media" (emphasis added).

43.     The 2016 presidential campaign impacted SITO Mobile's revenue during the 2016 fiscal year in a materially negative manner. However, Defendants

omitted this information from investors during SITO Mobile's initial public offering.

44.     Defendants did not disclose the effects of the 2016 presidential campaign until January 3, 2017, after SITO Mobile reported its preliminary financial results for the fourth quarter. At that time, Defendants revealed that SITO Mobile's revenue for the fourth quarter of fiscal 2016 had been "negatively affected . . . by restrained advertising spending during a period of heightened and elongated media focus on this year's U.S. election." In a press release dated January 3, 2017, Defendant Hug stated that, "[SITO Mobile] clearly underestimated the effects of this year's election on our clients' campaign spending."

**Defendants Negligently Misrepresented Material Facts about SITO Mobile**

45.     SITO Mobile's common stock began trading on the NASDAQ Capital Market on August 10, 2015. Prior to that time, the company's common stock was quoted on the OTCQB maintained by OTC Markets, Inc.

46.     On September 16, 2016, SITO Mobile conducted a public offering of its common stock. SITO Mobile did not engage in a public offering when it "uplisted" to the NASDAQ Capital Market in August 2015. Accordingly, SITO Mobile's offering in September 2016 offering was the company's first, or initial, public offering.

15

47.    In the offering, SITO Mobile sold 2,666,667 shares of its common stock at $3.75 per share to the general public. The company also sold an additional 400,000 shares of its common stock at $3.4875 per share to the underwriters of the offering pursuant to an underwriting option. The offering generated net proceeds of $10,320,001 in connection with the registration and issuance of 3,066,667 shares of common stock.

48.    The offering was made pursuant to a prospectus supplement dated September 16, 2016 and prospectus dated August 29, 2016. The prospectus supplement described the specific terms of the offering. The prospectus provided more general information about SITO Mobile.

49.    The prospectus supplement was part of a registration statement filed by SITO Mobile with the SEC on August 19, 2016. Defendants Jerry Hug and Kurt Streams signed the registration statement on behalf of SITO Mobile. The registration statement was also signed by Defendants Betsy J. Bernard, Jonathan E. Sandelman, Peter D. Holden, Joseph A. Beatty, Richard O'Connell, Jr., and Brent Rosenthal.

50.    SITO Mobile's registration statement, including the company's prospectus and prospectus supplement, did not disclose to investors that the company's sales and revenues were being impacted in a materially negative manner by the 2016 presidential election. As described above, the 2016

presidential election prompted an increase political advertising which, in turn, caused non-political retail customers to limit and/or avoid advertising spending.

51.     The effects of the 2016 presidential election had already materialized by September 16, 2016, the date of SITO Mobile's initial public offering. Despite strong demand for mobile advertising generally, SITO Mobile's third quarter media placement revenue remained roughly flat from the previous quarter (as opposed to increasing sequentially as it did in the year prior).

52.     The effects of the 2016 presidential election intensified closer towards the election. As SITO Mobile progressed into the fourth quarter, media placement revenue began to reverse course and decline materially.

53.     The following chart illustrates how the 2016 presidential election impacted SITO Mobile's media placement revenue:



54.     The impact of the 2016 presidential election on the company's sales and revenues was material and, accordingly, should have been disclosed in the course of SITO Mobile's initial public offering. Investors, including Lead Plaintiffs, would have considered this information when deciding whether to invest in SITO Mobile. The impact of the 2016 presidential election on the company's sales and revenues would have altered the total mix of information available to investors at the time of the company's initial public offering.

55.     The importance of this information is further evidenced by the fact that it was required to be disclosed pursuant to the Securities Act and Regulation S-K. Pursuant to the Securities Act and Regulation S-K (17 C.F.R. Part 229), SITO Mobile's registration statement, including the company's prospectus and prospectus supplement, was required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii).

56.     The 2016 presidential election qualified as a trend and/or uncertainty that had already impacted, and was reasonably likely to continue impacting, the company's sales and revenues. By failing to identify the 2016 presidential election as a known trend or uncertainty that was likely to impact the company's sales and

18

revenues in a materially negative manner, Defendants violated the Securities Act and Regulation S-K.

57.     SITO Mobile's prospectus supplement also stated the following, which similarly failed to disclose the manner in which the 2016 presidential election was impacting the company:

> **An adverse trend in sales during the holiday season could affect our financial results.**
>
> Historically, a high percentage of our annual sales have been attributable to the winter holiday selling season. In contrast, a substantial portion of our expenses are personnel related and include salaries, stock-based compensation, and benefits, which are not seasonal in nature. Accordingly, in the event of revenue shortfalls, we are generally unable to mitigate the negative impact on our results from operations in the short term.

58.     Defendants, in the statement above, failed to explain that the company's historical pattern of sales would not repeat itself during the 2016 fiscal year. As explained above, the 2016 presidential election had already impacted revenues and sales in a negative manner and would continue doing so through the fourth quarter of 2016. The statement identified above negligently represented to investors that the 2016 presidential election would not disrupt the company's ordinary patterns of sales.

59.     Defendants knew that the 2016 presidential election had impacted or would continue to impact the company's sales and revenues, but failed to appreciate the importance of this information and make the necessary disclosures.

19

Defendants acted with negligence by failing to disclose the ongoing impacts of the 2016 presidential election on the company's sales and revenues.

60.     Alternatively, Defendants should have known that the 2016 presidential election had impacted or would continue to impact the company's sales and revenues, but failed to perform the appropriate due diligence necessary to discover the fact that the 2016 presidential election had impacted or would continue to impact the company's sales and revenues. Defendants, having been active in the advertising industry, should have known the extent to which political elections impact advertising revenues. Defendants failed to identify and/or appreciate the ongoing effects of the 2016 presidential election and, for that reason, acted with negligence.

**Defendants Disclose Media Placement Revenue for the Fourth Quarter**

61.     SITO Mobile disclosed its financial results for the third quarter of 2016 on November 14, 2016. At that time, Defendants revealed that the company's media placement revenue for third quarter of 2016 had remained relatively flat compared with the second quarter of 2016. This was significant in light of the growth between the second and third quarters of 2015.

62.     Although Defendants did not attribute the lack of growth to the 2016 presidential election at that time, investors and analysts noticed and reacted accordingly. SITO Mobile's stock price fell from $5.34 per share on November 14,

20

2016 to $4.59 per share on November 15, 2016. SITO Mobile's stock price continued to fall over the next few days, ultimately closing at $3.94 per share on November 17, 2016.

63.    Before the marked opened on January 3, 2017, SITO Mobile issued a press release announcing the Company's preliminary media placement revenue results for the fourth quarter and year ended December 31, 2016. The press release stated the Company's media placement revenue was in the range of $7.3 million and $7.6 million, compared to media placement revenue of $5.5 million in the previous year's comparable quarter. The press release stated in relevant part:

> JERSEY CITY, N.J., January 3, 2017 (GLOBE NEWSWIRE) -- SITO Mobile Ltd. (NASDAQ: SITO), a leading mobile engagement platform provider, announced today that preliminary media placement revenue for the quarter ending December 31, 2016, is expected to be in the range of $7.3 -$7.6 million. SITO is scheduled to report its 4th quarter and full year results on March 28, 2017.
>
> ***SITO Mobile's 4th quarter was negatively affected this year by restrained advertising spending during a period of heightened and elongated media focus on this year's U.S. election***.
>
> Commenting on the quarter, Jerry Hug, SITO Mobile's CEO, said, "We are disappointed that Q4 ad revenue fell below our expectations after a very good year overall. ***We clearly underestimated the effects of this year's election on our clients' campaign spending***. Leading into the quarter, we saw seemingly normal activity levels and then ***revenue dropped off dramatically during the election window***. Revenue and bookings activity picked back up again in December. We continue to win new business and retain our valued customer relationships by leveraging SITO's effective and efficient location-based targeting in combination with fully transparent, real-time insights into marketers' campaigns. Additionally, we look forward to

introducing syndicated recurring data deals in 2017 to mitigate the variability of our financial performance."

(emphasis added)

64.     SITO Mobile's disclosure was received negatively by analysts and investors alike. The Maxim Group, an equity research firm, lowered its price target for SITO Mobile's stock from $9 per share to $6 per share. In its research report, the Maxim Group stated that SITO Mobile's fourth quarter media placement revenue was "disappointing" and that the firm was lowering its "growth rate assumptions" after "two consecutive disappointing quarters for Media Placement demand."

65.     Cowen and Company, another analyst research firm, also responded to SITO Mobile's announcement concerning its fourth quarter earnings. The report, titled "4Q Pre-Announcement: Revenue Slips on Election Headwinds," noted that SITO Mobile's fourth quarter Media Placement revenue was 12% below the previous quarter and 25% below Cowen and Company's estimates. Cowen and Company, similar to the Maxim Group, lowered its price target for SITO Mobile's stock from $6 per share to $4.50 per share.

66.     Investors, like the analysts, also perceived SITO Mobile's January 3, 2017 disclosures to be negative and reacted immediately in response thereto by selling their shares. The price of SITO Mobile's stock declined sharply in response to the Company's January 3, 2017 disclosure. From a closing share price of $3.69

per share on December 30, 2016 (the last trading day prior to January 3, 2017), SITO Mobile's stock price declined to $2.50 per share on January 3, 2017, a drop of approximately 32%, on unusually heavy trading volume.

## COUNT I

### Defendants Violated Section 11 of the Securities Act

67.     Lead Plaintiffs repeat and realleges the allegations contained above.

68.     Notwithstanding any allegations herein to the contrary, Lead Plaintiffs' claims against Defendants under the Securities Act are grounded in negligence and strict liability. Lead Plaintiffs does not allege fraudulent intent or scienter against Defendants in connection with the Securities Act claims.

69.     As set forth above, SITO Mobile's registration statement, including the prospectus and prospectus supplement, contained untrue and/or incorrect statements of material fact and omitted material facts required to be stated in order to make the statements contained therein accurate.

70.     SITO Mobile was the registrant for the offering. As issuer of the shares, SITO Mobile is strictly liable to Lead Plaintiffs and to the members of the Class for the materially untrue statements and omissions alleged herein.

71.     SITO Mobile's registration statement was signed by Defendants Hug and Streams on behalf of the Company.

72.     Defendants Bernard, Sandelman, Holden, Beatty, O'Connell, and Rosenthal each appointed Defendants Hug and Streams as their true and lawful attorneys-in-fact and agents for the purpose of "sign[ing] any and all amendments (including post-effective amendments) to the Registration Statement, and to sign any registration statement for the same offering covered by this Registration Statement that is to be effective upon filing pursuant to Rule 462(b) under the Securities Act of 1933, as amended, and all post effective amendments thereto . . . ." Defendants Bernard, Sandelman, Holden, Beatty, O'Connell, and Rosenthal signed or authorized others to sign the registration statement on their behalf.

73.     The Individual Defendants were directors and/or executive officers of SITO Mobile at the time of the filing of the registration statement.

74.     The Individual Defendants were named in the registration statement as being or about to become a director of, or person performing similar functions in, the SITO Mobile.

75.     Lead Plaintiffs and the other members of the Class purchased SITO Mobile securities in SITO Mobile's initial public offering and/or traceable to SITO Mobile's initial public offering.

76.     Lead Plaintiffs and the other members of the Class were damaged by Defendants as a direct and proximate result of the untrue statements and omissions in the registration statement.

77.     This claim was brought within the applicable statute of limitations.

78.     By reason of the foregoing, Defendants have violated Section 11 of the Securities Act and are liable to Lead Plaintiffs and the other members of the Class.

## COUNT II

### The Individual Defendants Violated Section 15 of the Securities Act

79.     Lead Plaintiff repeats and realleges the above allegations, as if fully set forth herein.

80.     SITO Mobile's conduct, as alleged herein, constitutes a violation of Section 11 of the Securities Act. The Individual Defendants are liable to Lead Plaintiffs and the other members of the Class, jointly and severally with and to the same extent as SITO Mobile, for violations under Section 15 of the Securities Act.

81.     The Individual Defendants participated in the operation and management of SITO Mobile at the time of the initial public offering and conducted and participated, directly and indirectly, in the conduct of SITO Mobile's business affairs.

82.     The Individual Defendants were involved in the day-to-day operations of the Company at the highest levels.

83.     The Individual Defendants possessed access to confidential proprietary information concerning the Company and its business and operations and possessed authority over the Company's public statements.

84.     The Individual Defendants were senior officers and/or directors of SITO Mobile.  Due to their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the registration statement, prospectus, and prospectus supplement that contained materially false and inaccurate information.

85.     The Individual Defendants signed, or caused to be signed on their behalf, the registration statement, prospectus, and prospectus supplement.

86.     The Individual Defendants authorized the filing of the registration statement, prospectus, and prospectus supplement with the SEC and signed or caused to be signed on their behalves the document(s) incorporated into the registration statement, prospectus, and prospectus supplement.

87.     The Individual Defendants were controlling persons of SITO Mobile under the Securities Act.

## CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### Defendants SITO Mobile, Hug, and Streams Intentionally Withheld Material Information about the 2016 Presidential Election

88.     Lead Plaintiffs incorporate herein ¶¶1-66 by reference. As alleged therein, the 2016 presidential election caused a decline in SITO Mobile's sales and revenues.

89.     Defendants SITO Mobile, Hug, and Streams knew as of the start of the Class Period that the 2016 presidential election had already impacted the

company's sales and revenues and would continue to do so until the election completed. Moreover, Defendants SITO Mobile, Hug, and Streams knew that they were actively misappropriating funds from the company through illicit expense reimbursement requests, cash withdrawals, and credit card charges.

90.     Notwithstanding, Defendants SITO Mobile, Hug, and Streams made public statements that materially misled investors so as to create a false impression that SITO Mobile's sales and revenues would not be impacted by the 2016 presidential election and that demand for the company's services would be substantially stronger than it in fact was during the Class Period. Defendants Hug and Streams also concealed their misappropriation scheme from the public while at the same time promoting the company through unduly positive statements concerning the demand for the company's services.

### Defendants Misrepresented Material Facts about SITO Mobile

#### August 15, 2016

91.     On August 15, 2016, SITO Mobile issued a press release announcing its financial results for the second quarter of fiscal 2016. The press release stated, in pertinent part, that:

> JERSEY CITY, N.J., August 15, 2016 (GLOBE NEWSWIRE) -- SITO Mobile Ltd. (NASDAQ: SITO), a leading mobile engagement platform, today announced its results for the second quarter ended June 30, 2016.

> **Second Quarter 2016 Business Highlights**

- **TOTAL REVENUE**: was $9.9 million, an increase of 168% year-over-year.

- **MEDIA PLACEMENT REVENUE**: (SITO Mobile's programmatic advertising revenue) was $8.3 million, an increase of 285% year-over-year and 71% sequentially.

- **GROSS PROFIT:** was $5.4 million (55% gross margin) in Q2 2016, up from $1.8 million (51% gross margin) in Q2 2015. (Please refer to the supplemental schedule below for calculation of Gross Profit and Gross Margin).

- **ADJUSTED EBITDA:** was $1.8 million for the quarter, up from $0.1 million in Q1 and ($0.2) million in Q2 of 2015. (See attached schedule for reconciliation of Adjusted EBITDA to GAAP)

- **NET INCOME:** was $0.7 million, which equates to $0.04 earnings per share on total shares outstanding of 17.4 million.

*"In the Second quarter, we produced early indications of the kind of consistent, solid revenue growth we're expecting as we work towards becoming a dominant player in location-based mobile advertising,"* said Jerry Hug, CEO of SITO Mobile. "The overall market for mobile advertising is already measured in $10's of billions and is growing rapidly. Mobile Media is uniquely equipped to handle location-based ad campaigns and SITO Mobile is emerging as a leading player in this $18 billion segment of the mobile advertising market. SITO Mobile is creating higher levels of mobile consumer engagement – resulting in more clients, more campaigns and larger campaign spending commitments, as the largest global advertisers shift significant advertising dollars to mobile. On this foundation, we look forward to producing meaningful revenue growth for the balance of 2016 and beyond."

(emphasis added)

92.     The statement identified above in emphasis was false and/or

materially misleading. As written, the press release represented to investors that

SITO Mobile's second quarter results would be indicative of the company's results for the third quarter. The third quarter was already halfway completed by the date of the press release, which led investors to believe that Defendant Hug in fact knew that the third quarter revenue was strong. The press release concealed the fact that SITO Mobile's sales and revenues had already begun to stall due to the 2016 presidential election. Moreover, Defendant Hug's statement within the press release misled investors in a substantial and material manner by creating the false impression the strong demand experienced in the second quarter would continue in the third quarter. This was not true.

93.    Later the same day, during an investor conference conference call to discuss the company's financial and operating results for the second fiscal quarter ended June 30, 2016, Defendant Streams stated in relevant part:

> Let me take a moment to talk about seasonality in the advertising business, and how that may affect our growth progression. We now have better visibility into future media placement revenue versus several quarters ago as a result of improved participation in advertiser's planning and request for mobile ad campaign proposals. So, precise predictions in the advertising business beyond our horizon of several weeks can be a difficult proposition.
>
> With that said, there are some typical seasonal patterns worth keeping in mind. As we discussed in our last call, typically the first quarter of the year start slow as post-holiday spending drops off considerably. Activity then builds through the quarter, gain strength, and through the second quarter as we've been demonstrated in our Q2 results. There has been typically a brief drop off in the early summer, and we did experience about a 10% less ad revenue dollars in July versus June, which was a record high month for us.

*Now, we are building bookings as the fall season approaches and we expect growth to continue through the holiday season. So while we expect strong year-over-year growth in the third quarter, we believe a sequential growth in Q3 will follow advertising seasonal trend of being modest versus Q2, and we expect Q4 to grow sequentially from Q3.* We plan to give you more color on that in our next earnings call in November.

(emphasis added)

94.    The statements identified above in emphasis were false and/or materially misleading. Similar to the statements in the press release, Defendant Streams represented to investors that "growth" would "continue through the holiday season" even though growth had already started to slow in the third quarter due to the 2016 presidential election. Moreover, instead of accurately disclosing the negative impact caused by the 2016 presidential election, Defendant Streams falsely represented to investors that the company's seasonal sales patterns would proceed as normal during the third and fourth quarters of fiscal 2016. These statements concealed the truth about negative effects of the 2016 presidential election that SITO Mobile had already started to experience.

95.    SITO Mobile also filed its quarterly report (Form 10-Q) on August 15, 2016, which was signed and certified under the Sarbanes Oxley Act of 2002 by the Defendants Hug and Streams.

96.    Pursuant to the Exchange Act and Regulation S-K (17 C.F.R. Part 229), SITO Mobile's quarterly report for the second quarter of fiscal 2016 was

30

required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii).

97.     The 2016 presidential election qualified as a trend and/or uncertainty that had already impacted, and was reasonably likely to continue impacting, the company's sales and revenues. By concealing the fact that the 2016 presidential election was a known trend or uncertainty that was likely to impact the company's sales and revenues in a materially negative manner, Defendants SITO Mobile, Hug, and Streams violated the Exchange Act and Regulation S-K.

98.     The false statements and/or misleading omissions within the press release, conference call, and quarterly report were material. The truth concerning the 2016 presidential election, and the effects it would have on the company's sales and revenues, would have been considered by investors when deciding whether to purchase SITO Mobile stock. This information, which related directly to the company's most important financial metrics, would have altered the total mix of information available to investors.

<u>September 16, 2016</u>

99.     SITO Mobile also filed a final prospectus supplement with the SEC on September 16, 2016. The prospectus supplement incorporated the company's

31

registration statement dated August 19, 2016, which was signed by Defendants Hug and Streams (among others).

100.   Pursuant to the Exchange Act and Regulation S-K (17 C.F.R. Part 229), SITO Mobile's quarterly report for the second quarter of fiscal 2016 was required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii).

101.   The 2016 presidential election qualified as a trend and/or uncertainty that had already impacted, and was reasonably likely to continue impacting, the company's sales and revenues. By concealing the fact that the 2016 presidential election was a known trend or uncertainty that was likely to impact the company's sales and revenues in a materially negative manner, Defendants SITO Mobile, Hug, and Streams violated the Exchange Act and Regulation S-K.

102.   The truth concerning the 2016 presidential election, and the effects it would have on the company's sales and revenues, would have been considered by investors when deciding whether to purchase SITO Mobile stock. This information, which related directly to the company's most important financial metrics, would have altered the total mix of information available to investors.

<u>November 14, 2016</u>

103.   On   November   14,   2016,   SITO   Mobile   issued   a   press   release announcing   the   company's   financial   and   operating   results   for   the   third   fiscal quarter ended September 30, 2016. The press release stated in relevant part:

> JERSEY CITY, N.J., November 14, 2016 (GLOBE NEWSWIRE) -- SITO Mobile Ltd. (NASDAQ: SITO), a leading mobile engagement platform, today announced its results for the third quarter ended September 30, 2016.
>
> **Third Quarter 2016 Business Highlights**
>
> - **TOTAL   REVENUE**: was $10.3 million, an increase of 129% year-over-year.
>
> - **MEDIA   PLACEMENT   REVENUE**: (SITO Mobile's programmatic advertising revenue) was $8.4 million, an increase of 179% year-over-year.
>
> - **GROSS PROFIT**: was $5.7 million (55% gross margin), up from $2.4 million (52% gross margin) in Q3 2015. (Please refer to the supplemental schedule below for calculation of Gross Profit and Gross Margin).
>
> - **ADJUSTED EBITDA**: was $1.8 million, up from a loss of $(0.7) million in Q3 of 2015. (See attached schedule for reconciliation of Adjusted EBITDA to GAAP)
>
> - **NET INCOME**: was $501 thousand which equates to $0.03 (diluted) earnings per share on total (diluted) shares outstanding of 19.5 million.
>
> "Q3 was another successful and productive quarter for SITO Mobile," said Jerry Hug, SITO Mobile's CEO. "***Our media placement business once again delivered stellar year-over-year growth and we made good progress on our key priorities. We added new customers and***

33

*increased total campaigns while also adding more partners to our data ecosystem. Our RFP pipeline is growing and our pool of opportunities is increasing as current and prospective clients begin to recognize, appreciate and embrace the value of SITO Mobile's location-based marketing platform.*"

Hug continued, "In September we raised $10.3 million in net proceeds through an equity offering. This successful offering was enabled by the strength of our strategic positioning in the mobile adtech marketplace coupled with our strong revenue growth and profitability. As a result of this offering, we added several new institutional shareholders and increased market awareness and liquidity. The proceeds from this offering strengthen our balance sheet, and provide financial flexibility as we execute our plan."

(emphasis added)

104.   The statement identified above in emphasis was false and/or materially misleading. As written, the press release represented to investors that SITO Mobile's operations were growing and that demand for the company's services had been increasing. The fourth quarter was already halfway completed by the date of the press release, which led investors to believe that Defendant Hug in fact possessed data to support his statements. The press release concealed the fact that SITO Mobile's sales and revenues had already underwent a significant decline due to the 2016 presidential election.

105.   Later the same day, SITO Mobile held a conference call to discuss the company's financial and operating results for the third fiscal quarter ended September 30, 2016. During the conference call, Defendant Hug stated:

34

Thanks, Joe. Good afternoon to everyone on the line and thank you for joining us on our call today. Q3 was another successful and productive quarter that delivered solid results. Our core media placement business met expectations, once again delivering excellent year-over-year growth. ***We made good progress on our key priorities, grew our RFP pipeline and we continue to maintain a very positive outlook for the balance of the year and beyond.*** In late Q3, we also significantly improved our balance sheet and our overall corporate profile through a successful equity offering.

. . .

***We've had an excellent 2016 thus far with lots of accomplishments and very healthy revenue growth and we have a very positive outlook for the remainder of this year and throughout 2017.*** On this foundation, we are in excellent position to grow revenues and earnings significantly from here in the coming years.

(emphasis added)

106.   Defendant Streams, during the conference call, stated that:

Thanks, Jerry. I will briefly review our financial performance for the quarter, again reminding you that we are now operating on the December 31 calendar year for financial reporting purposes. For Q3 2016, SITO produced total revenue of $10.3 million, a 129% increase over Q3 2015. The improvement was led by continuing growth in our media placement revenue, which grew 179% to $8.4 million for the third quarter compared to $3 million for last year's Q3 and up slightly sequentially, ***as our revenues flattened out due to August being a seasonally slower month***.

Our year over year increase is due to the growth in the number of our sales people, our customers and the mobile ad campaigns we ran. ***We expect these same factors to drive strong year over year growth in the 4th quarter***. Media placement revenue is now the vast majority of our total revenue production. In Q3, media placement revenue was generated by over 100 different clients and around 425 different campaigns demonstrating our continued revenue diversification and scalable platform. The media placement business is our core revenue growth engine and we expect to maintain and

35

grow this diverse revenue base in the coming quarters as we had customers and attract a larger share of their advertising budgets. For Q3, our wireless applications' SMS revenue was approximately $1.7 million, up 33% from Q3 2015.

(emphasis added)

107.   During the question-and-answer segment of the conference call,

Defendant Streams further stated that:

> **<Q: Mike Malouf, Analyst>** And then with regards to the media placement business. Can you talk a little bit about seasonality, I know we were flat or roughly flat up 1.5% for the September quarter, I know that's sort of where you guided to especially coming out of the summer. How does - how should we expect the fourth quarter with regards to seasonality and then maybe some comments on March as well because you've got a lot of sort of cross-currents going on with regards to the growth.
>
> **<A: Kurt Streams>** *Well, Q4 is seasonally our stronger quarter in the advertising business and it's that way for SITO as well. So you should think of it that way, we think it's going to be strong year over year. It's also going to be you know it's a strong seasonal quarter.* The Q1 quarter is typically seasonally a slower quarter again just based on the timing of ad spends and the way ad agencies are planning cycles work. And then with regards to margin, we made the remark that our margins were in the mid 50s and now the margins will fluctuate a little bit depending on revenue opportunities that we see before us. But we like the margin levels that we're running the business at.

(emphasis added)

108.   Defendant Hug, in response to analyst questions, stated as follows:

> **<Q: Jon Hickman, Analyst>** Real quick question, can you tell us if there was much - did you get much lift in this quarter from the political campaign, the elections campaign ads?

**<A: Jerry Hug>** *So we did not, Jon, and the action or the activities that we saw in our political product were more down ballot than in the general.*

**<Q: Jon Hickman, Analyst>** So there won't be any like a meaningful drop off in all of the stuff over right?

**<A: Jerry Hug>** *That's correct. There will not be.*

(emphasis added)

109.   Defendant Hug's and Streams' statements during the November 14, 2016 conference call were extremely misleading in light of the fact that the 2016 presidential election had already completed and, consequently, the company had already experienced a significant decline in its sales and revenues as a result thereof. Notwithstanding, Defendants Hug and Streams represented to investors that demand for the company's services had been significant through the third quarter and into the fourth quarter. Defendant Streams also represented that the company's normal seasonal sales patterns would proceed uninterrupted by the election. Defendant Hug even represented to investors, in response to a direct question from an analyst, that the company suffered no negative consequences in response to the political elections. These statements were false and materially misleading.

110.   SITO Mobile also filed its quarterly report (Form 10-Q) for the third quarter of fiscal 2016 on November 14, 2016. The quarterly report was signed and

certified under the Sarbanes Oxley Act of 2002 by the Defendants Hug and Streams.

111.   Pursuant to the Exchange Act and Regulation S-K (17 C.F.R. Part 229), SITO Mobile's quarterly report for the third quarter of fiscal 2016 was required to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. 229.303(a)(3)(ii).

112.   The 2016 presidential election qualified as a trend and/or uncertainty that had already impacted the company's sales and revenues. By concealing the fact that the 2016 presidential election was a known trend or uncertainty that had already impacted the company's sales and revenues in a materially negative manner, Defendants SITO Mobile, Hug, and Streams violated the Exchange Act and Regulation S-K.

113.   The false statements and/or misleading omissions within the press release, conference call, and quarterly report were material. The truth concerning the 2016 presidential election, and the effects it would have on the company's sales and revenues, would have been considered by investors when deciding whether to purchase SITO Mobile stock. This information, which related directly to the

company's most important financial metrics, would have altered the total mix of information available to investors.

114.   Defendant SITO Mobile's, Hug's, and Streams' false and/or materially misleading statements fraudulently portrayed SITO Mobile's operations and finances in an overwhelmingly positive light. Notwithstanding, investors perceived that the company's financial results were amiss. SITO Mobile's revenue growth was weak relative to the 2015 fiscal year. Defendant Streams stated during the November 14, 2016 conference call that revenue for the third quarter increased "slightly sequentially, as our revenues flattened out due to August being a seasonally slower month."

115.   Although Defendant Streams concealed the fact that the slow growth was due to effects from the presidential election, investors perceived Streams' statements and the company's financial results to constitute a partial corrective disclosure and reacted accordingly. In response to these disclosures, SITO Mobile's stock price declined from a closing price of $5.34 per share on November 14, 2016 to $4.59 per share on November 15, 2016. SITO Mobile's stock price continued to fall over the next few days, ultimately closing at $3.94 per share on November 17, 2016. The declines in SITO Mobile's stock price occurred on unusually heavy volume.

<u>January 3, 2017</u>

116.   Investors did not discover the truth concerning the impact of the 2016 presidential election until January 3, 2017. On that day, SITO Mobile issued a press release announcing the Company's preliminary media placement revenue results for the fourth quarter and year ended December 31, 2016.

117.   As alleged previously, the press release revealed that "***SITO Mobile's 4th quarter was negatively affected this year by restrained advertising spending during a period of heightened and elongated media focus on this year's U.S. election***." (emphasis added)

118.   In addition, Defendant Hug stated within the press release that "[w]e are disappointed that Q4 ad revenue fell below our expectations after a very good year overall. ***We clearly underestimated the effects of this year's election on our clients' campaign spending***. Leading into the quarter, we saw seemingly normal activity levels and then ***revenue dropped off dramatically during the election window***." (emphasis added)

119.   The statements within the press release directly contradicted Defendant SITO Mobile's, Hug's, and Streams' earlier statements during the Class Period. Moreover, the statements within the press release clarified Streams' statements during the November 14, 2016 conference call about seasonality and

confirmed that the reason for the company's stagnant revenue during the third quarter was in fact due to the negative effects from the 2016 presidential election.

120.   SITO Mobile's disclosure was received negatively by analysts and investors alike. The Maxim Group, an equity research firm, lowered its price target for SITO Mobile's stock from $9 per share to $6 per share. In its research report, the Maxim Group stated that SITO Mobile's fourth quarter media placement revenue was "disappointing" and that the firm was lowering its "growth rate assumptions" after "two consecutive disappointing quarters for Media Placement demand."

121.   Cowen and Company, another analyst research firm, also responded to SITO Mobile's announcement concerning its fourth quarter earnings. The report, titled "4Q Pre-Announcement: Revenue Slips on Election Headwinds," noted that SITO Mobile's fourth quarter Media Placement revenue was 12% below the previous quarter and 25% below Cowen and Company's estimates. Cowen and Company, similar to the Maxim Group, lowered its price target for SITO Mobile's stock from $6 per share to $4.50 per share.

122.   Investors, like the analysts, also perceived SITO Mobile's January 3, 2017 disclosures to be negative and reacted immediately in response thereto by selling their shares. The price of SITO Mobile's stock declined sharply in response to the Company's January 3, 2017 disclosure. From a closing share price of $3.69

per share on December 30, 2016 (the last trading day prior to January 3, 2017), SITO Mobile's stock price declined to $2.50 per share on January 3, 2017, a drop of approximately 32%, on unusually heavy trading volume.

### Defendants SITO Mobile, Hug, and Streams Acted with Scienter

123.   Defendants SITO Mobile, Hug, and Streams engaged in an intentional and/or deliberately reckless course of conduct with regard to the false and materially misleading statements identified above. Contrary to their public statements, these defendants knew that the true state of affairs at the company was materially different. These defendant intentionally misled investors, or acted with a deliberate disregard as to the risk of misleading investors, for their own personal gain.

### Defendants Hug and Streams Possessed Information that Directly Contradicted Their Public Statements

124.   Defendants Hug and Streams served as SITO Mobile's CEO and CFO, respectively, during the Class Period. In their capacities as the company's most senior executive officers, Hug and Streams were actively engaged in the day-to-day management of SITO Mobile's operations. This included monitoring the company's media placement operations, sales, revenues, and, in particular, whether the company's sales and revenues were being impacted by the 2016 presidential election.

125.   Defendants Hug's and Streams' statements during the Class Period establish that they actively monitored all material developments within the company's media placement operations. For example, on August 15, 2016, during the company's second quarter investor conference call, Defendant Streams stated as follows:

> Let me take a moment to talk about seasonality in the advertising business, and how that may affect our growth progression. ***We now have better visibility into future media placement revenue versus several quarters ago as a result of improved participation in advertiser's planning and request for mobile ad campaign proposals***. So, precise predictions in the advertising business beyond our horizon of several weeks can be a difficult proposition.

(emphasis added)

126.   In addition, statements made by Defendant Hug to representatives of Lead Plaintiffs prior to Lead Plaintiffs' investment show that Hug was fully aware of all events and occurrences within the company's media placement operations. These statements were made during a private conversation between Hug and a representative of Lead Plaintiffs on June 2, 2016. SITO Mobile's Senior Vice President, Investor Relations, Joseph Wilkinson, was also present for the meeting. During the meeting, Hug discussed SITO Mobile's media placement business in detail, identifying customers, expected revenue, and plans for growth.

127.   Subsequent conversations between Hug, Streams, and Lead Plaintiffs further confirm the fact that Hug and Streams actively managed the company's

media placement operations. For example, during a meeting on or around September 13, 2016, Hug and Streams discussed the company's detailed plans to hire additional sales personnel, including strategies for particular locations throughout the country as well as strategies for hiring sales personnel for particular channels and segments of the market.

128. Information obtained from a former employee of SITO Mobile corroborates the fact that Defendants Hug and Streams actively monitored the company's media placement operations, including sales, revenues, and, in particular, the extent the company's sales and revenues were impacted by the 2016 presidential election. According to a former Director of Sales that worked for the company between 2011 and 2016 and who was responsible for and highly involved in SITO Mobile's sales processes, the company utilized *Salesforce* as a means of tracking and organizing its sales. Members of the sales team, directors, and executives had access to *Salesforce* and would enter "leads" into *Salesforce*. "Leads" were generated through solicitations over the telephone as well as general research through television, radio, and billboard displays. If a "lead" was developed into a sale, the terms of the sale (or campaign) would have to be approved by a manager or executive, *i.e.*, vice president or executive vice president employees. Once approved, the terms of the sale were entered into *Salesforce* in

44

order to allow the company to monitor contractual terms, deadlines, and all other information about the advertising campaign.

129.  The importance of the company's media placement operations to SITO Mobile itself also confirms that Defendants Hug and Streams actively monitored the company's media placement operations and, in particular, how the 2016 presidential election impacted these operations. SITO Mobile's media placement segment was, by far, the company's most vital operation. Media placement revenue constituted 98% of the company's total revenue for fiscal 2016 and 51% of the company's total revenue for fiscal 2015. Importantly, whereas SITO Mobile generated revenue from its wireless applications segment in 2015, the company's wireless applications segment was discontinued during 2016. Accordingly, SITO Mobile's media placement operation qualified as a "core operation" for the company.

130.  Given the importance of SITO Mobile's media placement segment to the company's overall operations, Defendants Hug and Streams kept fully informed of all material developments within the company's media placement operations. This includes developments concerning the company's sales and revenues and whether they were being impacted by the 2016 presidential election.

131.  Defendants SITO Mobile, Hug, and Streams represented to investors during the Class Period that demand for the company's media placement services

45

was strong, that any weakness in sales was due to regular seasonality, and that the ongoing 2016 presidential election had not negatively impacted the company's sales and revenues. These defendants made these statements despite knowing that the company's sales and revenues had in fact stalled and/or declined because of the negative impact from the 2016 presidential election. Consequently, Defendants SITO Mobile, Hug, and Streams acted with scienter.

<u>Defendants Hug and Streams Benefitted Personally from the Fraud</u>

132. Defendants Hug and Streams engaged in the fraudulent conduct described above in order to benefit financially in a personal manner. By making the false and materially misleading statements they did, Hug and Streams successfully inflated the stock price and generated a substantial amount of capital. The motive for financial gain underlying Hug's and Streams' conduct supports a strong inference of scienter.

133. Defendants Hug and Streams had been engaging in a scheme during the Class Period whereby they were misappropriating corporate funds for personal benefit. Although SITO Mobile initially portrayed Hug's and Streams' respective departures from the company as "resignations," the company revealed in its annual report for fiscal 2016 (Form 10-K) that they had in fact left the company in connection with an investigation over the potential misappropriation of corporate funds. The company's annual report stated, in pertinent part, as follows:

46

On February 17, 2017, Jerry Hug resigned as Chief Executive Officer and director of the Company. Also, on March 10, 2017, Kurt Streams resigned as Chief Financial Officer of the Company. ***Following the resignation of Mr. Hug, our Audit Committee engaged an independent law firm and an accounting consulting firm to conduct an inquiry into the use of the Company's charge and debit cards, as well as certain cash withdrawals. The ongoing inquiry identified the misappropriation of company funds by each of Streams and Hug***. The company is implementing stronger compliance with company policies and enhancements to its controls and procedures with respect to these matters.

(emphasis added)

134.   SITO Mobile confirmed, later in the annual report, that the investigation in fact resulted in a finding that Defendants Hug and Streams had misappropriate corporate funds in the aggregate amount of $330,000. The annual report stated, in pertinent part, as follows:

> ***The independent law firm and accounting consulting firm completed the inquiry and concluded that over two years, the former CEO/CFO had misappropriated approximately $330 thousand in aggregate including credit and debit cards, cash withdrawals, and extra payroll***. This amount was identified to have been properly expensed in the appropriate periods.
>
> Management does not believe that this deficiency increased the likelihood of a material misstatement to more than remote since mitigating controls did exist and operated effectively during the fiscal year for proper identification and classification of the transactions. Financial reconciliations are reviewed on a monthly basis by management in an effort to identify large variances or unknown fluctuations. Additionally, consolidated results are reviewed by executive management as part of the quarterly financial and compliance review process.

*In response, the Company has eliminated the debit card and use of petty cash*. With regards to the use of credit cards, all authorized users are now required to send in reconciliations with supporting backup and valid business reasons on a monthly basis as the statements are available. There is a monthly card limit in place, and periodically the Board will review a summary of charges.

*A travel and entertainment policy has been created and will be distributed to all employees for 2017*. This policy details the types of allowed expenses, in addition to limitations which require supporting documentation and valid business reasons. An agreement has been executed for 3rd party expense software to add an automated level of approval, and is in the process of being implemented across the Company for expense tracking and reporting.

(emphasis added)

135.   Misappropriation of corporate funds is a serious form of corporate misconduct. Defendants Hug and Streams developed a scheme whereby they were able to siphon company proceeds from the company through seemingly innocuous expense reimbursement requests, cash withdrawals, and credit card invoices. In order to maintain this scheme, Defendants Hug and Streams needed to generate enough capital so as to render the amounts they were stealing either trivial in size or unnoticeable relative to the company's overall cash flow.

136.   Defendants furthered their misappropriation scheme by conducting the company's initial public offering in September 2016. By way of the initial public offering, Defendants successfully generated over $10 million in corporate proceeds. The proceeds generated from the public offering would have been sufficient to conceal the amounts of cash that Hug and Streams had been stealing

from the company and, therefore, would have allowed Hug and Streams to continue their misappropriation scheme for the foreseeable future.

137.   In order to successfully hold the public offering, however, Hug and Streams needed to generate a significant amount of demand for SITO Mobile's common stock in the market. Defendants Hug and Streams accomplished this by making the false and materially misleading statements identified above. Through their fraudulent statements, Defendants Hug and Streams were able to generate enough interest in the company's offering to make it successful in terms of generating additional capital which, in turn, they used to benefit themselves through their misappropriation scheme.

138.   The amounts that Hug and Streams had already stolen, and intended to continue stealing, were significant. Defendants Hug's and Streams' salaries for fiscal 2015 and 2016 ranged between approximately $200,000 and $300,000. Accordingly, the amounts that they had already stolen were substantial compared to the amounts they were receiving as salary compensation.

139.   Defendants Hug and Streams certified the financial reports of SITO Mobile each quarter. Accompanying each quarterly and annual report, Hug and Streams signed certifications pursuant to the Sarbanes-Oxley Act of 2002. These certifications represented that SITO Mobile's reports disclosed all required material information, including "[a]ny fraud, whether or not material, that involves

49

management or other employees who have a significant role in the registrant's internal control over financial reporting."

140.   Defendants Hug and Streams attested to the contents of SITO Mobile's reports even though they were personally involved in a misappropriation scheme. The fact that Defendants Hug and Streams signed these certifications while knowing they were false all but confirms that they acted with scienter during the Class Period.

141.   In addition to stealing money directly from the company, Defendants Hug and Streams also profited in connection with vested, but unexercised options that they held. The following chart displays the stock price of SITO Mobile between February 2016 and March 2017:



142.   As illustrated above, SITO Mobile's stock price increased during the Class Period in connection with Defendant Hug's and Streams' false and

materially misleading statements. SITO Mobile's stock price increased to an intra-Class Period high of $5.60 per share on October 10, 2016.

143.   During the Class Period, Defendant Hug owned 256,040 shares of SITO Mobile common stock underlying fully vested, but unexercised stock options. Hug also owned 42,060 shares of SITO Mobile common stock underlying unexercisable stock options. The exercise price for Hug's options ranged from $2.805 per share to $6.50 per share, with the majority of his options having an exercise price of $4.69 per share.

144.   Similarly, Defendant Streams owned 33,412 shares of SITO Mobile common stock underlying fully vested, but unexercised stock options, and 66,824 shares of SITO Mobile common stock underlying unexercisable stock options. The exercise price for Streams' options ranged from $2.805 per share to $6.20 per share.

145.   At the start of the Class Period, SITO Mobile's common stock traded at approximately $4.00 per share. Between August 15, 2016 and November 14, 2016, during the Class Period, SITO Mobile's average common stock price was $4.88 per share. Accordingly, by making the false statements they did, Defendants Hug and Streams successfully placed a substantial portion of their options "in the money."

146.   The motive shared by Hug and Streams to artificially inflate the price of SITO Mobile stock is corroborated by statements during the June 2, 2016 meeting between Hug and a representative of Lead Plaintiffs. During the meeting, Hug explained that he intended on obtaining financing for the company through a public offering. Hug stated further, however, that he did not want to conduct an offering at that point in time because the price of SITO Mobile's common stock was too low. Hug explained that he intended on conducting a public offering in August 2016 or sometime after he announced the company's financial earning results for the second quarter of fiscal 2016.

147.   Defendant Hug's statements during the June 2016 meeting support the conclusion that Hug was mindful of the price of SITO Mobile's common stock and intent on increasing the price of SITO Mobile's common stock for the purposes of benefitting himself. Hug's statement also show that he intended his statements to have the effect that they did, which shows that he acted with scienter.

148.   Defendant Hug and Streams possessed a unique, personal motive to artificially inflate SITO Mobile's stock price. In connection with the public offering as well as their stock options, Hug and Streams each benefitted financial from the price of STIO Mobile's common stock. The financial motives behind Hug's and Streams' fraudulent statements support a strong inference of scienter.

## Application of Presumption of Reliance: Fraud-on-the-Market Doctrine

149.   The market for SITO Mobile's stock was open, well-developed and efficient at all relevant times.

       a.     SITO Mobile stock met the requirements for listing, and was listed and actively traded on the NASDAQ Capital Market, a highly efficient and automated market. During the Exchange Act Class Period, average daily trading volume exceeded 18,000 shares per day;

       b.     As a regulated issuer, SITO Mobile filed periodic public reports with the SEC and/or NASDAQ Capital Market;

       c.     SITO Mobile regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

       d.     SITO Mobile was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these

reports was publicly available and entered the public marketplace.

150.   As a result of the foregoing, the market for SITO Mobile stock promptly digested current information regarding SITO Mobile from all publicly available sources and reflected such information in SITO Mobile's stock price, as evidenced by the price reactions to the disclosure on January 3, 2017.

151.   Defendants' materially misleading statements and/or omissions of material fact caused SITO Mobile shares to trade at artificially inflated prices during the Class Period.

152.   Lead Plaintiffs and other members of the Class purchased or otherwise acquired the Company's stock relying upon the integrity of its market price, which reflected all information available to the market concerning SITO Mobile, including Defendants' materially misleading statements and material omissions, and have been damaged thereby.  When, at the end of the Class Period, Defendants issued new public statements to the market that disclosed the facts previously omitted, and corrected the misleading statements previously issued, the artificial inflation was removed and the Company's share price collapsed.

153.   Under these circumstances, all purchasers of SITO Mobile's stock during the Class Period suffered similar injury through their purchase of SITO Mobile shares at artificially inflated prices, and a presumption of reliance applies.

154.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding SITO Mobile's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

155.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## Loss Causation

156.   Defendants' materially misleading statements and omissions during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing the Company's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Lead Plaintiffs and other members of the Class.

157. As alleged herein:

    a.    the market for SITO Mobile's stock was open, well-developed and efficient at all relevant times;

    b.    Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and the market price of the Company's shares to be artificially inflated during the Class Period;

    c.    Lead Plaintiffs and other members of the Class purchased or otherwise acquired SITO Mobile stock relying upon the integrity of the market price for SITO Mobile shares and market information relating to SITO Mobile;

    d.    Immediately following disclosure made by Defendants on January 3, 2017 that corrected the misleading statements made by Defendants during the Class Period and/or marked materialization of risks concealed by Defendants during the Class Period, SITO Mobile's share price suffered severe devaluation.

158. Defendants withheld material information concerning the 2016 presidential election, and the impact it had on the company's sales and revenues, throughout the Class Period. The information that Defendants withheld related to the "political crowd out" effect caused by increased political advertising. This, in turn, caused non-political retail advertisers to avoid spending on advertising.

159. Investors who purchased SITO Mobile stock during the Class Period were unaware of the risks associated with the 2016 presidential election, *i.e.*, the political advertising would have a negative material effect on the company's sales and revenues, and only learned of them when they materialized through the company's third- and fourth-quarter earnings for fiscal 2016.

160. In sum, Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class. During the Class Period, Lead Plaintiffs and other Class members purchased SITO Mobile's stock at prices artificially inflated by Defendants' materially misleading statements and omissions, and when the misleading statements that Defendants made to the market were corrected, and/or the information alleged herein to have been concealed from the market was revealed, the price of the Company's stock significantly declined, causing Lead Plaintiffs' and Class Members' losses.

## CLAIMS FOR RELIEF

## COUNT III

### Violation of Section 10(b) of the Exchange Act
### and SEC Rule 10b-5 Against Defendants

161.   Lead Plaintiffs incorporate herein ¶¶1-66, 88-160 by reference.

162.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

163.   Defendants violated §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

164.   Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SITO Mobile common stock. Lead Plaintiffs and the Class would not have purchased SITO Mobile common stock at the prices they paid, or at all, if they had

58

been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

165.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of SITO Mobile common stock during the Class Period.

## COUNT IV

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

166.   Lead Plaintiffs incorporate herein ¶¶1-66, 88-165 by reference.

167.   The Individual Defendants acted as controlling persons of SITO Mobile within the meaning of §20(a) of the Exchange Act, as alleged herein.  By reason of their high-level positions with the Company, their ownership of SITO Mobile stock, their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and materially misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of the Company, and caused SITO Mobile to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Lead Plaintiffs contend are false and misleading.

168.   The Individual Defendants were provided with or had access to: Company reports, press releases, public filings and other information and statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

169.   As set forth above, the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Moreover, by virtue of their positions as controlling persons, the Individual Defendants had the power and authority to, and did, cause Arrowhead to engage in the wrongful conduct alleged.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## NO SAFE HARBOR

170.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

171.   In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SITO Mobile who knew that the statement was false when made.

172.   The safe harbor does not apply to Lead Plaintiffs' claims under the Securities Act. Pursuant to 15 U.S.C. §77z-2, the statutory safe harbor does not apply to any "forward-looking statement . . . made in connection with an initial

public offering." SITO Mobile's September 2016 offering qualified as an "initial public offering." Therefore, by statute, the safe harbor provision does not apply.

## CLASS ACTION ALLEGATIONS

173. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired SITO Mobile common stock in or traceable to SITO Mobile's initial public offering and/or on the NASDAQ Capital Market between August 15, 2016 and January 2, 2017, inclusive, and were damaged upon the revelation of the alleged corrective disclosures (the "Class"). The period between August 15, 2016 and January 2, 2017, inclusive, is referred to herein as the "Class Period." Excluded from the Class are Defendants, the officers and directors of the Company, and, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

174. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members the Class is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

175.   As of November 14, 2016, SITO Mobile had 20.6 million shares of common stock outstanding. Throughout the Class Period, SITO Mobile shares were actively traded on NASDAQ, with average daily trading exceeding 18,000 shares per day. Record owners and other members of the Class may be identified from records maintained by SITO Mobile or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

176.   Lead Plaintiffs' claims are typical of the claims of the members of the Classes, as all members of the Class are similarly affected by Defendants' wrongful conduct, in violation of federal securities laws, complained of herein.

177.   Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

178.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

> a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> b.   whether Defendants' public statements during the Class Period were materially misleading, and/or omitted material facts;

63

c.      whether Defendants acted with scienter in making false or

misleading statements during the Class Period; and

d.      whether members of the Class have sustained damages and, if

so, the proper measure thereof.

179.    A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class Members

may be relatively small, the expense and burden of individual litigation makes it

impossible for members of the Class to individually redress the wrongs done to

them. There will be no difficulty in the management of this action as a class action.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of

the Federal Rules of Civil Procedure;

(b)     Appointing Lead Plaintiffs as representatives of the Class, and

appointing Levi & Korsinsky LLP as Class counsel;

(c)     Awarding compensatory damages in favor of Lead Plaintiffs and the

other Class members against all Defendants, jointly and severally, for all damages

sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

including interest thereon;

(d)     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.

Dated: June 22, 2017                    **LEVI & KORSINSKY LLP**


*/s/ Eduard Korsinsky*
Eduard Korsinsky (EK-8989)
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: ek@zlk.com

- and -

Nicholas I. Porritt
    (to be admitted *pro hac vice*)
Adam M. Apton
    (*admitted pro hac vice*)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: aapton@zlk.com

*Attorneys for Lead Plaintiff and
Lead Counsel for the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2017, I caused the foregoing Amended Complaint for Violations of the Federal Securities Laws to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List generated by the CM/ECF system.


_/s/ Eduard Korsinsky_
Eduard Korsinsky